FILED

2023 Sep-07 AM 08:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
HUNTSVILLE DIVISION

| | |
|---|---|
| ANGELA HUTTO, as representative of the ESTATE OF MARTY R. HUTTO, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| | CIVIL ACTION NUMBER: |
| JUSTIN TODD FAGAN, in his individual capacity, | ) ) ) |
| Defendant. | ) ) ) |

## COMPLAINT

The undersigned, Angela Hutto, appearing as the personal representative of the Estate of Marty Robbin Hutto, initiates this lawsuit to seek monetary damages and remedies for the violation of rights safeguarded under 42 U.S.C. §1983 and or §1988. This legal action addresses the encroachment upon rights, privileges, or immunities established by the Constitution of the United States and State of Alabama.

## I.    INTRODUCTION

1.    Law enforcement is legally required to use a level of force proportional to the level of threat they are facing. This case involves the wrongful killing of Marty Robbin Hutto, by a deputy sheriff, Justin Fagan, who was plainly incompetent, or acted intentionally with a reckless disregard for Hutto's constitutional rights and well-being.

1

2.     The facts asserted herein show Fagan's use of deadly force was not objectively reasonable given the circumstances.

3.     Based on the facts below and causes of action, Plaintiff respectfully asks this Court to hold Fagan accountable for his actions and award just compensation to Hutto's estate.

## II.     JURISDICTION AND VENUE

4.     The authority of this Court is invoked for Counts I - II pursuant to 28 U.S.C. § 1331 or § 1367(a), because each is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and each alleges violations of the United States Constitution or pendent state-law claims.

5.     Proper venue in this division and district is established by 12 U.S.C. § 1391(b)(2) since a significant portion of the events or omissions that establish the claim took place within this division and district. Furthermore, under 28 U.S.C. § 1391(b)(1) and (c)(2), venue is appropriate in this division and district based on the residency of Fagan.

## II.     PARTIES

6.     Marty Robbin Hutto, a Caucasian male, was 51 years old when he passed away on August 6, 2022. He lived in Lawrence County, Alabama, and was both a resident and a citizen of that county.

7.     Angela Hutto, the plaintiff, is older than nineteen years and holds

residency and citizenship in Lawrence County, Alabama. The Probate Court of Lawrence County granted Ms. Hutto this designation on April 21, 2023 (Estate 71 169).

8.     The defendant, Justin Todd Fagan, is a Caucasian male, 31 years old, and holds residency and citizenship in Lawrence County, Alabama. He is sued solely in his personal capacity and not in any official capacity.

## III.   <u>STATEMENT OF FACTS</u>

9.     Fagan, also known as Justin Todd Fagan, completed a deployment in overseas combat and came back to his home in late 2021.

10.    Upon his return, community members observed changes in Fagan's behavior, noting he displayed irritability, excessive aggression, unpredictability, and a quick temper.

11.    While on duty as a Lawrence County Sheriff Deputy, Fagan openly disclosed to a resident that he experienced Post-Traumatic Stress Disorder ("PTSD") as a result of his military service.

12.    People have posted the following about Fagan,

Well girl almost everybody in the county will tell you he has major issues withntemperment and attitude and he has mental issues and anger problems and he is an alcoholic and has been known numerous times to be drinking on duty ▮▮▮▮ friend told her there has been numerous formal complaints made against him with the sheriff's office. The girl

\*\*\*\*

How the fuck did Justin get cleared to work

Can y'all use his military service against like he is clearly unstable and doesn't need to be on the streets

\*\*\*

He's trapped in a war state of mind which is scary for every single person he comes in contact with

\*\*\*

He had an altercation with him at DG if I'm not mistaken because he made a post on Facebook and multiple people commented on it saying that he was abusive of his power to them also.

\*\*\*

▮▮▮▮ grew up with him and ▮▮▮ is horrified of being pulled over by him, so that tells you something c

13.    In late 2021, the Sheriff's Office hired Fagan, who was required to graduate from an academy sanctioned by the Alabama Peace Officers Standards &

4

Training Commission ("APOSTC") before commencing his duties.

14.    Fagan's initial training started in January 2022 at the Jefferson County Sheriff's Office Training Center – Law Enforcement Academy ("JCSOTC"). He completed this training after about 16 to 17 weeks.

15.    Roughly three months after this training, Fagan employed objectively unreasonable force by intentionally discharging his service weapon through the side window of a stationary and inoperable truck. This action led to the fatal injury of Hutto, who was unarmed when shot, and seated in the driver's seat.

16.    Fagan did not know Hutto to be dangerous to law enforcement or others. After all, he was a member of law enforcement, he was Hutto's Facebook friend, and somehow Hutto's acquaintance.

17.    The Sheriff's Office communicated to the media that on or around 9:15 p.m. of August 6, 2022, Fagan unsuccessfully tried to initiate a traffic stop on Hutto near the junction of CR 214 and CR 217.

18.    If Fagan tried to initiate a traffic stop, oddly, he did so without the use of his sirens or emergency lights.

19.    Security video shows and or witnesses have stated,

    a.    Shortly after 9:00 p.m., a law enforcement officer's transmission over the police scanner indicated a pursuit of Hutto. When asked about the location, the officer reported, "traveling north on CR 217, just before CR 214."

    b.    Around 9:07 p.m., on CR 217, beyond the intersection of CR

214 and CR 217, past Reed's Mini Mart but before Don Roden Foreign Cars, Hutto was observed heading north towards Hillsboro. He maintained proper speed, stayed within his lane, utilized headlights, and exhibited no suspicious or reckless behavior. *See* Exemplar,



c.      As Hutto's truck started to pass in front of a witness' property, a law enforcement cruiser rapidly approached from behind, decelerated, and closely followed without activating its siren or flashing emergency lights. Subsequently, the cruiser abruptly maneuvered into the opposing lane, seemingly attempting to pass Hutto's truck and continue on its way.

d.      Still, the cruiser did not overtake Hutto's truck. Instead, it continued to travel parallel until both vehicles left the witnesses sight, still without ever engaging emergency lights or an audible siren. After they passed, despite the straight road and unobstructed area, the witness never saw flashing lights or heard a siren from the direction they were heading.

e.      Minutes later, the witness observed two new law enforcement cruisers, with blue emergency lights flashing. They progressed in the same direction as Hutto's truck.

f.      A police scanner transmission by a law enforcement officer conveyed a location update, affirming Hutto's turn onto CR 222. The same officer later requested dispatch of a state trooper.

g.      A law enforcement officer's voice was then heard on the police

6

scanner conveying that Hutto had entered a cornfield.

h.      Although no member of law enforcement communicated that Hutto exhibited armament or that he directed a firearm or object resembling a firearm at anyone, sometime after Hutto entered the cornfield, an officer transmitted, "Shots fired, shots fired." About a minute later, the same officer radioed, "suspect down."

i.      Over the police scanner, an inquiry related to the shooter's identity was met with the law enforcement officer clarifying that he, not Hutto, discharged the shots.

j.      Eighteen minutes after Hutto's initial sighting on CR 217, at 9:25 p.m., an ambulance was observed traveling on CR 217 in the same direction as Hutto and the other law enforcement officers.

20.    Fagan and the Sheriff's Office have not asserted that Hutto sought to use his vehicle as a weapon against law enforcement, nor have they claimed that he used his vehicle to threaten injury to the officer or others.

21.    Hutto did not try to employ his vehicle as a weapon.

22.    Contrary to the accounts provided by witnesses and the available evidence, the Sheriff's Office communicated to the media that the deputy's pursuit of Hutto concluded upon Hutto's truck encountering mechanical issues on CR 222.

23.    Consistent with the information witnesses gleamed from police scanners, and corroborated by alternative sources, Hutto's truck navigated a dirt access road next to a cornfield. Later, he executed a left turn onto the power-company right-of-way, which traverses Chicken Foot Mountain, and after that he entered a steep muddy ditch/brook causing the truck's abrupt stop and

immobilization. The truck came to rest nearly half a mile from CR 222. Refer to these photographs illustrating the exact location where Hutto's truck became trapped.





24.    From this ditch/brook, it is a one-mile drive to the nearest residence, over half a mile on foot, and at least a three-mile drive to the next closest dwelling, one mile on foot.

25.    Fagan pulled up behind Hutto's incapacitated truck, surveyed the situation, and exited his cruiser believing the motor vehicle pursuit had concluded

and would not start again.

26. Fagan advanced on foot towards the truck on its left side.

27. Hutto had never threatened to physically harm Fagan, and Fagan had no reasonable reason to perceive or believe that Hutto would or could use the disabled truck to place his life or others in imminent danger.

28. Nevertheless, Fagan pointed his service weapon at Hutto, who remained inside the truck's cab, facing forward, and Fagan discharged the weapon from various impact angles and degrees to the left of the truck.

29. Fagan intended to use deadly force against Hutto, that is, Fagan did not discharge his firearm by mistake or accident.

30. Fagan fired five bullets, all of which struck the truck's cab or near its cab.

31. An investigator-identified bullet, labeled No. 1, penetrated the truck's roof slightly above the rear driver's side cab door, nearly at the juncture of the door's upper section and the truck's frame. The numerical identification of the bullet holes may not correspond with the order in which the shots were fired.

32. The bullet's parabolic trajectory and distinctive point of entry indicate that Fagan discharged it while positioned further to the truck's left.



33.     An investigator-identified bullet, marked No. 2, penetrated the rear

driver's side cab window, positioned five to seven inches above the window's base

and three to four inches inward from the window frame. *See*,



34.     The distinct keyhole shape of the bullet entrance hole indicates its

trajectory into the window, ant that it traveled towards the driver's seat.

35.     After penetrating the glass, Bullet No. 2 pierced the rear of the

driver's seat before exiting on the seat's left side where the back of the driver's left

arm is normally found. *See*,



36. Bullet No. 2 exited the seat but did not create another point of entry within the interior of the cab.

37. An investigator-recognized cluster of three bullets, labeled Nos. 3-5, impacted the left side of the truck's cargo bed, directly behind the cab. *See,*



38. Notably, Hutto was right-handed, and Fagan shot Hutto from a superior elevated position left of the truck as reflected by the bullet entrance holes

above and the description of the bullet's path within the autopsy report.

39.     Out of the five discharged bullets, one struck Hutto and proved fatal.

40.     Drawing on the autopsy report and supplementary corroborating evidence, it is incontrovertible that Bullet No. 2 caused Hutto's demise.

41.     The configuration of the five bullet entry holes, their positions, the resulting pinch points, exit holes, or their absence, coupled with the absence of bullet entry points in or near the interior of the driver's door, collectively indicate that Fagan aimed at an occupant still situated within the truck's cab with his back to Fagan, rather than someone who exited the vehicle and turned to point a weapon at him.

42.     Still, the Sheriff's Office communicated to the media that Hutto exited the truck, pointed a modified flare gun at Fagan, and that prompted Fagan to open fire hitting Hutto in his side.

43.     The Sheriff's Office's communications to media were based, in part or whole, on statements made by Fagan describing the events that took place.

44.     That night Fagan's service weapon was loaded with non-deforming rounds characterized as fully jacketed bullets.

45.     Typically, these bullets retain their shape unless they encounter an intermediate object before entering the body and remain intact if they do not exit the body.

46.     The bullet that killed Hutto first impacted or penetrated an intermediary object, as shown by the absence of an intact, undistorted, or unfragmented bullet recovered during the autopsy. *See* also, Excerpts from the Firearm Analysis,

**FIREARMS ANALYSIS REPORT**

| | |
|---|---|
| **Alex Guynn** | **ADFS Case Number** 22HM00390 |
| **SBI - Major Crimes - Russellville Office** | **Case Initiated Date** 08/08/2022 |
| **14369 Hwy 43** | **Start Date** 10/19/2022 |
| **Russellville, AL 35653** | **Report Date** 10/27/2022 |
| | **Report ID** 120425072 |

**Subject(s)**    Marty Hutto

On 08/19/2022, Kelli Hallman of the Alabama Department of Forensic Sciences transferred Items 1P and 1Q to the Birmingham Regional Laboratory. The following is a description of the evidence and the results of the requested analysis.

1P.    One (1) manila envelope labeled in part "arm", containing one (1) paper fold containing one (1) fired bullet jacket fragment.

1Q.    One (1) manila envelope labeled in part "ventricle", containing one (1) paper fold containing one (1) fired metal jacketed bullet.

\*\*\*

ADFS Case Number 22HM00390
FIREARMS ANALYSIS REPORT
Report ID 120425072

Item 1P is too damaged for any caliber classification.

Comparisons between Items 1P and 1Q, the bullet jacket fragment and bullet, were inconclusive due to insufficient individual microscopic characteristics.

*Opinion/Interpretation:*

Item 1Q, the bullet, exhibits characteristics found in (but not limited to) the following firearms: Glock .380 Auto and 9mm Luger caliber firearms.

47.     Nor did Hutto sustain a gunshot wound to his side as depicted by the Sheriff's Office. Rather, discussed *infra*, he was shot once in the back of his arm, and that bullet traveled downward through his chest, left to right, and back to

13

front.

48.    Medical experts define "death" as the point in time when the heart stops beating. In the context of a shooting, it can take seconds after death for the injured to become incapacitated. That was not the circumstance here given the nature of Hutto's wound.

49.    The bullet wound destroyed Hutto's heart, caused instant death, and instant and total incapacitation.

50.    Based on the autopsy report and post-mortem photographs, medical experts have concluded that the Bullet No. 2 traveled through Hutto's chest causing him to experience an immediate and total loss of blood pressure. The drop in blood pressure stems from the amalgamation and discharge of oxygenated and deoxygenated blood as it drained from the perforated pulmonary and aortic arteries. From there Hutto's blood filled the pericardial sac surrounding his heart before exiting through that perforated sac and pooling in his chest cavity.

51.    This deprived Hutto's brain, muscles, and other organs of any oxygenated blood otherwise retained in a closed circulatory system and accessible for use by skeletal muscle in the seconds after a fatal shot and or "death."

52.    Consequently, Hutto would have experienced an immediate loss of cognitive function, muscle control, vision, and consciousness, rendering him unable to see Fagan, think, stand, intentionally or unintentionally throw, or discard

14

a weapon.

53.    The Autopsy Report shows a deformed, fragmented bullet struck Hutto in the back of his left arm causing an irregular bullet wound entrance; it traveled left to right in front of the shoulder blade, slightly downward, and back to front.

    a. Consistent with the path traveled by Bullet No. 2, when a bullet first penetrates an intermediate object before striking an individual, the bullet deforms, sometimes fragments, and causes an atypical, irregular gunshot entrance wound.

    b. A bullet that has first passed through an intermediate object, *e.g.*, a tempered glass window, may leave embedded in the skin around the wound or in the wound, pieces of the bullet's core, and if jacketed the jacket; here both occurred.

54.    The Autopsy Report identifies that on the back of Hutto's left arm around the bullet entry wound the existence of pseudo-stippling, also referred to as pseudo-tattooing.

    a. Stippling or tattooing generally refers to multiple punctate abrasions of the skin, similar in size, due to the impact of small fragments of unburnt gunpowder.

    b. Pseudo-stippling or pseudo-tattooing, mimics true stippling, and refers to multiple punctate abrasions of the skin because of the impact of small fragments of material other than unburnt gunpowder. Pseudo-stippling results when a bullet penetrates an intermediate object before it and the debris cloud it created impacts the person.

        1) If a bullet passes through a sheet of glass, pseudo-stippling may be produced by the fragments of glass in the debris cloud.

15

          i.     This is seen mostly in individuals shot through the tempered-glass side window of an automobile. Such glass stippling tends to be "scant" as well as larger and more irregular than powder tattoo marks.

*See* also Autopsy Report Excerpts, Firearm Analysis Report Excerpts, Photographs of the back of Hutto's left arm shirt sleeve, and the back of his left arm (emphasis added),

### FINAL DIAGNOSES

I.    Gunshot wound of the left arm into the chest
  A. Indeterminate range gunshot wound of the left posterolateral proximal arm, with pseudostippling
  B. Path: left arm, third left anterior rib, left lung, pericardial sac, left atrium, atrial septa, pulmonary artery, aorta, and enters the right atrium of the heart
  C. Left hemothorax, 1000 milliliters; hemopericardium, 200 milliliters
  D. Bullet recovery: right ventricle
  E. Trajectory: left to right, downward and back to front

\*\*\*
### EVIDENCE OF INJURY

GUNSHOT WOUND OF THE LEFT ARM INTO THE CHEST:
A 3/8 x 3/16-inch irregular gunshot wound of entrance is in the posterolateral left proximal arm and centered 3-1/4 inches below the top of the left shoulder, 3-1/2 inches left of the vertical axillary midline and 11 inches left of the anterior vertical torso midline. Irregular abrasions surround this wound and range from 1/8 inch to 1/2 inch in greatest dimension. A puncture wound is at the 9 o'clock position of this wound and approximately 1/2 inch in distance from the wound margin. No soot or stippled abrasions are associated with this entrance wound. Scant punctate abrasions and a minute fragment of bullet core embedded into the surrounding skin is apparent. A deformed copper jacket fragment is recovered from the entrance wound. Following perforation of the skin and subcutaneous tissues of the left arm, the bullet perforates the soft tissues of the anterior left chest, third left anterior rib, upper lobe of the left lung, pericardial sac, left atrium, atrial septa, pulmonary artery, aorta, and enters the right atrium of the heart. A deformed, copper-jacketed bullet is found entangled within the papillary muscles of the right ventricle where it is recovered. The trajectory of this gunshot wound is left to right, downward and back to front.

16







55.     An Alabama state trooper was first to arrive on the scene after Fagan

radioed that he had discharged his service weapon.

56.     Upon arrival, the trooper observed the driver's side door of Hutto's

truck ajar, with Hutto lying next to the truck. Hutto's arms and hands were positioned beneath his body, while his feet and lower legs were underneath the truck.

57.    The trooper's observation of Hutto's arm placement and the position of his feet and legs beneath the truck contradicts the Sheriff's Office's assertion that Hutto exited the truck and was then shot.

58.    Rather, the position of Hutto's arms, feet, and legs suggests an unconscious fall from the truck, or the placement of his body there by an individual. This fact is bolstered by the minimal to non-existent dirt found on the soles, uppers, backs, and sides of his boots — an almost complete absence of mud everywhere but on the toe tips of Hutto's boots.

59.    The trooper approached Hutto, who did not move or respond to commands, leading him to conclude that Hutto was dead.

60.    From various vantage points, including atop the truck's bed looking down on Hutto's back and from within the truck's cab, the trooper observed no firearm or object resembling a firearm around or near Hutto's body nor in the truck's cab. Fagan told the trooper he had not approached the body or truck after the shooting. The truck's engine was off when the trooper arrived.

61.    An ambulance was dispatched at 9:20 p.m. *See* Ambulance Report Excerpt (emphasis added),

18

| Trip Number 002221354 | D.O.S. 8/6/2022 21:20:00 | Patient:   marty hutto | | Page No:   2/2 |
| --- | --- | --- | --- | --- |

**Call Times / Mileage**

**Times**

| Onset Time: | 8/6/2022 21:20:34 | Arrived Patient: | 8/6/2022 21:30:01 | Back At Zone: |
| --- | --- | --- | --- | --- |
| PSAP Time: | 8/6/2022 21:20:00 | Transferred: | | |
| Dispatch Notified: | 8/6/2022 21:20:01 | Left Scene: | | |
| Unit Notified: | 8/6/2022 21:20:02 | Arrived Destination: | | |
| Unit Enroute: | 8/6/2022 21:20:04 | Back In Service: | 8/6/2022 23:20:00 | |

62.    Soon after, Fagan was spotted parking his cruiser at Reed's Mini Mart. He exited the cruiser and subsequently left in another law enforcement officer's vehicle. Fagan's parked cruiser exhibited no signs of damage, contradicting the Sheriff's Office's assertion to the media that it was substantially damaged when Hutto threw small objects out the window to disable the cruiser.

63.    Investigators from the Alabama Law Enforcement Agency ("ALEA") were dispatched to the scene to document and investigate the shooting.

64.    Upon arrival, like the state trooper, the coroner did not observe any firearm or object resembling a firearm near, on, or around Hutto's person.

65.    The ambulance reached the scene at 9:30 p.m., but the state trooper denied it access to the then-designated crime scene. The ambulance remained stationary until a cancellation was enacted at 11:20 p.m. *See* also, Ambulance Report Excerpts (emphasis added and personal identifier redacted),

| Arrived Scene: | 8/6/2022 21:30:00 | Canceled: | 8/6/2022 23:20:00 |
| --- | --- | --- | --- |

\*\*\*

19

***Narrative***

LA 59 RESPONDED TO A CALL FOR OFFICER INVOLVED SHOOTING GWS UNKNOWN HOW MANY
AND ONE VICTIM. UPON ARRIVAL STATE TROOPER ███████ WOULD NOT ALLOW EMS INTO THE
NOW CRIME SCENE. NO PATIENT CONTACT WAS INVOLVED. AT THIS POINT THE SCENE WAS
LEFT WITH THE CORONERS OFFICE AND STATE DEPARTMENT. PATIENT INFORMATION WAS
GIVEN BY STATE TROOPER ███████

66.    Investigators lifted and relocated Hutto's body, but no firearm or firearm-like object was found where he lay or in proximity.

67.    The state trooper left later, after canceling the ambulance, but still no one had located the firearm Hutto allegedly pointed at Fagan.

68.    While the trooper answered other inquiries, he declined to offer an opinion on whether he believed Fagan's account of the night's events.

69.    State investigators released Hutto's body for transport to the Alabama Department of Forensic Sciences, and the coroner left the scene.

70.    When the coroner left, still no one had found Hutto's alleged firearm or an object resembling a firearm.

71.    At 12:00 a.m., Fagan's cruiser was still parked at the mini mart.

72.    Various members of law enforcement entered and exited the scene until nearly 2:00 a.m. The lock was removed from Hutto's truck toolbox, and family members that went to Hutto's home observed it had been ransacked by someone as if looking for something.

73.    The Sheriff's Office impounded Hutto's truck.

74.    Deputies that returned to the Sheriff's Office laughed and celebrated Hutto's death, and joked about Hutto thinking he could avoid arrest, but "they

20

showed him."

75. Sheriff Sanders returned to the Sheriff's Office and commented that he hoped the shooting would not affect his chance at re-election.

76. At no time did the Sheriff's Office seek to notify Hutto's family that he had been killed.

77. The next day, the Sheriff's Office announced that ALEA was handling the investigation into the deputy involved shooting, and as part of that investigation, evidence, and body camera footage was sent to the state.

78. It was also announced that Fagan would remain on a leave of absence until the conclusion of the investigation, though Fagan returned to active duty right after, many months before the conclusion of the investigation by ALEA or the district attorney's review.

79. On or around August 10, 2022, Hutto's friends and family photographed his truck at the impound, documenting its condition and interior, the bullet holes marked by state investigators, and importantly, the absence of the lock on Hutto's truck toolbox, which was present on the toolbox the afternoon the day of the shooting.

80. Observers among Hutto's friends and family noted the presence of blood in the interior of the truck's cab, particularly around the driver's seat.

81. Daniel Hutto Kelley, Hutto's son, along with Daniel's mother,

Marilyn Kelley, asked about the procedure and timing for Daniel to take possession of his father's truck.

82.    The attendant informed them that there was no record of ownership for the truck, as no one had registered it in years.

83.    The attendant further communicated that the truck would be auctioned after 30 days, and Daniel could participate in the auction.

84.    In an illogical move, shortly after family and friends photographed the truck and while investigations into the shooting remained open, the Sheriff's Office and sheriff's son (the district attorney's investigator), facilitated and approved the transfer of a critical piece of evidence to Hutto's ex-girlfriend — Hutto's bullet-riddled truck. She had criminal drug charges pending then and had cooperated with the Sheriff's Office in the past.

85.    Upon Hutto's sister confronting Sheriff Sanders regarding the release of the truck to Hutto's ex-girlfriend, he acknowledged the ex-girlfriend submitted a false bill of sale to obtain the truck. He advised it was out of his hands and that if she was not happy, she should take Hutto's ex-girlfriend to civil court.

86.    By August 15, 2022, Fagan had deleted all his past Facebook posts.

87.    Upon Fagan's premature return from administrative leave, he engaged in multiple physical altercations, and to end a motor vehicle chase, he crashed his cruiser, head-on, into the suspect's vehicle, causing his and the

suspect's hospitalization.

88.    At first when asked, the coroner offered that Hutto was shot while standing outside the truck and pointing a gun at Fagan. To explain how that was physically possible given Hutto was shot in the back of the left arm, the coroner speculated the bullet had ricocheted off the truck's body.

89.    Then, the undersigned sent letters of preservation to the Sheriff's Office, the coroner's office, and the district attorney's office.

90.    Afterward, the coroner confirmed Plaintiff's version of this shooting is plausible: Hutto was shot through the rear side window of his truck while still in the driver's seat. But the coroner reiterated he had not seen the video footage.

91.    Historically, when ALEA exonerates a law enforcement officer operating within Lawrence County, the issue is closed, and the district attorney does not present the matter to a grand jury.

92.    Here, after ALEA concluded its investigation and issued its findings, the district attorney empaneled a group of county employees to allegedly view the body camera footage and opine as to whether he should present Fagan's shooting of Hutto to a grand jury; later, despite the sheriff's son working for him as an investigator, the district attorney presented the matter to a grand jury in lieu of recusal and allowing another district attorney to present the matter.

93.    To date, the Sheriff's Office has consistently denied all members of

Hutto's family access to the video footage from that night.

94.    The undersigned requested via letter dated October 7, 2022, to view the video footage showing what took place the night of August 6, 2022. *See* Excerpts,

> Sheriff Sanders,
>
> Concerning the shooting and subsequent death of Marty R. Hutto, I represent his son and sister, Mr. Daniel Kelley, and Ms. Angela Hutto. I am investigating the Mr. Hutto's death and any legal claims that may arise therefrom, including allegations of wrongful death, and or alleged violations of his civil rights. I am positive it is your position, or the position of your counsel, that the actions of those involved in the shooting were appropriate before, during, and after the incident. If their actions support those beliefs, I do not wish to waste the department's time or resources with the filing of a civil complaint.
>
> Consequently, I am writing to request and schedule an appointment for my review of any unedited video related to the incident, e.g., body-cam footage, patrol car footage, or otherwise, as well as unedited photographs (digital or hardcopy), unedited audio recordings, and the complete autopsy report. I take my responsibilities under Fed. Rule Civ. Pro Rule 11 very seriously and at your counsel's request I will execute a mutually agreed upon confidentiality agreement that precludes my disclosure of the contents of anything reviewed outside litigation. This letter is my good faith attempt to avoid litigation that may later prove unwarranted and or avoid a court's involvement. Please have your department's legal counsel contact me or my paralegal, Latrice Broadnax at 205-314-0500, or by email at rcamp@wigginschilds.com.

95.    The undersigned's request went unanswered.

96.    The undersigned requested again via letter dated January 25, 2023, to view the video footage. *See* Excerpt,

Sheriff Sanders,

I advised you via certified letter, dated October 7, 2022, that I represent Marty Hutto's son and sister, and within that letter I requested an appointment to view the unedited video, etc., related to the shooting death of Marty Hutto ("Hutto"). That request went unanswered. Our investigation into the shooting is nearly complete. Based on photographs of Mr. Hutto's truck while impounded, photographs of his body post-autopsy, photographs of the scene taken the day after Marty Hutto's death, the complete autopsy report, witness interviews, and the opinions of a former forensic investigator and medical professionals, we believe to hide his use of excessive force that Deputy Justin Todd Fagan misrepresented to you the circumstances that led to his shooting of Hutto.

***

As I said in my last letter, I do not wish to burden you or any deputy with civil litigation if the actions taken that night did not violate the law. I implore that this time you respond to my request and schedule a time for me to view the video footage so we can potentially avoid litigation. Without seeing that video, I presently have no reason to believe litigation is not appropriate. Consistent with my last letter, I am willing to sign a mutually agreed upon confidentiality agreement that prohibits my disclosure of any video content outside civil litigation.

97.    That request also went unanswered.

98.    The reasonable inference from the preceding paragraphs, 91-94, is that the body camera evidence is not exculpatory.

99.    August 6, 2023, Fagan, and other deputies celebrated the anniversary of Hutto's death.

## IV.    CAUSES OF ACTION

### FEDERAL CLAIM

**A. COUNT I: VIOLATIONS OF U.S. CONST., AMENDS. IV, THROUGH 42 U.S.C. § 1983 (AGAINST FAGAN IN HIS INDIVIDUAL CAPACITY)**

100.    Count I sets forth a cause of action against Fagan in his individual capacity, under 42 U.S.C. §§ 1983 and 1988, for violating the Fourth Amendment of the United States Constitution.

101. In support of this claim, Plaintiff incorporates by reference Paragraphs 4 - 99 (*supra*), as if fully detailed here.

102. The unedited video footage captured by Fagan's or other deputies' or law enforcement's cameras, supports Plaintiff's claim and is incorporated as fact.

103. At no juncture during Fagan's pursuit of Hutto did Hutto employ his truck as a weapon or indicate an intention to do so.

104. The Sheriff's Office has never alleged that during the motor vehicle chase, Hutto sought to inflict on law enforcement serious physical harm. Instead, it alleged that during the motor vehicle chase, Hutto tried to disable the pursuing cruiser using small objects dropped from the moving truck's window.

105. The preceding assertion is contradicted by a) the family's and friends' inability the next day to locate any such object on or around the route traveled by Hutto and Fagan, b) the failure of the Sheriff's Office to find and take into evidence any item Hutto allegedly used, c) Fagan's undamaged cruiser, discussed *supra*, and d) the Sheriff's policy requiring deputies cease any motor vehicle chase where continued pursuit of the fleeing suspect endangers others on or near public roadways.

106. Fagan did not end his pursuit of Hutto because he perceived no danger to others on or near the public roadway.

107. The Sheriff's Office did not discipline Fagan for his continued

pursuit of Hutto because there was no danger to others on or near the public roadway.

108.   Fagan was not injured during his pursuit of Hutto.

109.   At the time, Hutto's attempts to elude Fagan, if true, were misdemeanors under Alabama law.

110.   Hutto was known within the Sheriff's Office as a "runner", that is, he would not, and had not, confronted law enforcement with violence; instead, he would try to run to avoid arrest.

111.   Fagan did not have probable cause to believe Hutto had committed a crime involving the infliction or threatened infliction of serious bodily harm.

112.   The night of August 6, 2022, given the remote proximity of Hutto's disabled truck, the unarmed Hutto posed no immediate threat to Fagan, other officers, or others.

113.   When Fagan shot Hutto, he knew Hutto's truck was disabled, the vehicle chase had ended, and that Hutto could not use the truck to escape or immediately inflict bodily harm.

114.   When Fagan shot Hutto from behind, through his truck's rear side-window: a) the truck's motor was off, b) he could not see Hutto's hands, and c) Hutto was still facing forward in the driver's seat with his arms and hands inside the vehicle.

115.   When fatally wounded, Hutto was not actively resisting arrest or trying to evade arrest.

116.   Because Fagan shot Hutto while he sat in his disabled truck, Fagan could not have first determined or known whether Hutto would try to flee on foot.

117.   Because Fagan shot Hutto while he still sat in his disabled truck, Fagan could not see Hutto's hands and whether he possessed a weapon, and he could not have first determined or known whether the use of deadly force was necessary to facilitate Hutto's arrest, nor could he determine the appropriate amount of force necessary relative to that need.

118.   Because Fagan shot Hutto while he sat seated in his disabled truck, Fagan could not have first determined or known whether the use of deadly force was necessary to prevent Hutto's escape or whether deadly force was necessary to prevent immediate serious bodily injury.

119.   Because Hutto was seated in his truck, the truck was inoperable, and the remote location meant others were not in immediate danger, there was sufficient time for Fagan to consider his use of deadly force and warn Hutto of his intent to use deadly force.

120.   Despite sufficient time, Fagan failed to warn Hutto that he would or intended to use deadly force.

121.   Based on the preceding, Paragraphs 100 – 120, while acting under

color of law within the meaning of 42 U.S.C. § 1983, Fagan deprived Hutto his right to be free from unreasonable searches and seizures, which includes the right to be free from the use of excessive force.

122.    A seizure occurs when an officer performs an investigatory stop, displays his weapon, or uses deadly force to prevent a person from leaving.

123.    Given the circumstances, Fagan used unreasonably excessive force to seize Hutto when he intentionally shot Hutto.

124.    Fagan knew his use of excessive force against Hutto violated Hutto's constitutional rights. Like all graduates of academies approved by the Alabama Peace Officers Standard and Training Commission ("APOSTC"), the basic training Fagan received at JCSOTC covered these legal issues:

    a.  Constitutional foundations.

    b.  Detention, arrest, use of force, search, and seizure law.

        1) The interpretation and applicability of these terms, statutes, and case decisions:

            i.  Color of Law
           ii.  18 U.S.C. §§ 241-242
         iii.  U.S. Constitution, Amendments IV, XIV-XV
         iv.  *Terry v. Ohio,* 392 U.S. 1 (1968)
          v.  *Tennessee v. Garner,* 471 U.S. 1 (1984)
        vi.  *Graham v. Conner,* 490 U.S. 386 (1989)

    c.  Civil and criminal liability law.

        1)  The interpretation and applicability of this statute:

i.   42 U.S.C. §§1983 and 1985

125.   Contrary to the description of events released by the Sheriff's Office, medical experts contend that Hutto could not have left the truck, aimed a firearm at Fagan, and still have been struck in the back of his left arm by Fagan's bullet given the angle of trajectory necessary to cause the bullet to pass in front of Hutto's shoulder blade, moving back to front, left to right.

126.   Contrary to the description of events released by the Sheriff's Office, medical experts assert that the bullet wound Hutto suffered immediately incapacitated him, preventing him from standing, catching his fall, gripping an object, pointing an object, or hurling an object away from his person.

127.   Consistent with the preceding, Hutto was not armed when shot as no one found a firearm, flare gun, or object resembling a firearm near, on, or under Hutto's body.

128.   The evidence discussed herein was reviewed by a former law enforcement officer/forensic investigator. He concluded that on the night of August 6, 2022, given the totality of the circumstances set forth here, a competent and reasonable law enforcement officer, knowing what Fagan knew and standing in Fagan's shoes when he shot Hutto, would not have used deadly force at that moment or believed the use of deadly force against Hutto was reasonable, proper, proportionate, or necessary. He also concluded that the shooting could not have

occurred as publicly depicted by the Sheriff's Office.

129. The relatively soil-free state of Hutto's clothing and boots in light of the muddy conditions; reports and analysis issued by the Alabama Department of Forensic Science; photographs of the truck and Hutto's body, post-mortem; the trajectories of the bullets; the resulting wound; the path of the bullet within Hutto's body; the opinions of medical experts; and the opinion of a former forensic investigator, demonstrate Fagan shot Hutto while he sat in his truck and that Fagan could not have shot Hutto while he stood outside his truck, or while exiting the truck, regardless of his body's orientation relative to Fagan.

130. This evidence conflicts Fagan's accounts provided the Sheriff's Office, and is poof of pretext: Fagan knowingly used excessive force.

131. Fagan is not entitled to immunity because at the time of this incident, it was clearly established that the following constitutes the use excessive force in violation of the Fourth Amendment: a) the use of deadly force to prevent the escape of a person that poses no immediate threat or harm to officers or others, b) shooting an unarmed man in a stationary vehicle with no reason to believe he poses an immediate threat to the officer or others, c) the use of deadly force on an unarmed and non-threatening suspect, d) the gratuitous use of force against a suspect no longer resisting arrest, e) shooting a retreating unarmed suspect without first warning of intent to use deadly force.

132. Based on the preceding, ¶¶ 4–99 and 102-131, reasonable jurors could conclude that given the circumstances,

    a. Fagan intentionally used deadly force against Hutto,

    b. Fagan's use of deadly force was excessive and not objectively reasonable given the circumstances, and,

    c. Fagan knew his use of deadly force against Hutto violated Hutto's federally protected constitutional rights.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Fagan; (2) award Plaintiff compensatory damages arising out of Hutto's death consistent with federal common law remedies, including, but not limited to, special damages for lost wages and benefits, and general damages sufficient to compensate Plaintiff for Hutto's lost future earning capacity and vindicate his valuable intangible rights violated by Fagan; (3) award Plaintiff attorney's fees, expert witness fees, court costs, and interest as allowed by law; and (4) award Plaintiff all other relief deemed proper by the Court.

## STATE CLAIM

### A. COUNT II: VIOLATION OF ALA. CODE § 6-5-410 (ALABAMA WRONGFUL DEATH STATUTE) THROUGH 42 U.S.C. §§ 1983 AND 1988 (AGAINST FAGAN IN HIS INDIVIDUAL CAPACITY)

133. Count II sets forth a cause of action against Fagan in his individual capacity, under 42 U.S.C. §§ 1983 and 1988, for violating the Alabama Wrongful Death Statute.

134. The plaintiff re-alleges and incorporates by reference paragraphs 4-99 and 102-132 above, with the same force and effect as if fully set forth in specific detail here.

135. The wrongful acts of Fagan described herein were carried out with a reckless or conscious disregard for Hutto's rights and safety.

136. Fagan had a duty not to use excessive force against Hutto and he intentionally used excessive force proximately causing Hutto's death on August 6, 2022.

137. Fagan is not entitled to immunity because he failed to discharge his duties pursuant to detailed rules, he acted beyond his cope of authority when doing so, he acted in bad faith or under mistaken interpretation of the law.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Fagan; (2) award Plaintiff punitive damages; and (3) award Plaintiff all other relief deemed proper by the Court.

Respectfully submitted,

/s/ Robert J. Camp
Robert J. Camp
Counsel for the Plaintiff

34

OF COUNSEL:
**WIGGINS, CHILDS, PANTAZIS,**
**FISHER & GOLDFARB, L.L.C.**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500